IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

W. L. (BILL) ARMSTRONG;
JEFFREY S. MAY;
WILLIAM L. (WIL) ARMSTRONG III;
JOHN A. MAY;
DOROTHY A. SHANAHAN; and
CHERRY CREEK MORTGAGE CO., INC.,
a Colorado corporation,

      Plaintiffs,

v.

KATHLEEN SEBELIUS, in her official capacity as
Secretary of the United States Department of Health
and Human Services;
SETH D. HARRIS, in his official capacity
as Acting Secretary of the United States Department of Labor;
JACOB J. LEW, in his official capacity as Secretary
of the United States Department of the Treasury;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES;
UNITED STATES DEPARTMENT OF LABOR; and
UNITED STATES DEPARTMENT OF THE TREASURY,

      Defendants.

## VERIFIED COMPLAINT

PLAINTIFFS W. L. (BILL) ARMSTRONG, JEFFREY S. MAY, WILLIAM L. (WIL)

ARMSTRONG III, JOHN A. MAY, DOROTHY A. SHANAHAN, and CHERRY CREEK

MORTGAGE CO., INC., a Colorado corporation, by and through their attorneys Michael J.

Norton and others undersigned of Alliance Defending Freedom and Natalie L. Decker of the

Law Office Of Natalie L. Decker, LLC, for their complaint against the Defendants above-named,

state and allege as follows:

## NATURE OF THE CASE

1. This case is about religious freedom. In this action, Plaintiffs seek declaratory and injunctive relief for the Defendants' violations of the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.* (herein "RFRA"), the First and Fifth Amendments to the United States Constitution, and the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (herein the "APA") caused by the actions of the Defendants in implementing the Patient Protection and Affordable Care Act (Pub. L. 111-148, March 23, 2010, 124 Stat. 1029) and the Health Care and Education Reconciliation Act (Pub. L. 111-152, March 30, 2010, 124 Stat. 1029) (collectively known and herein referred to as the "Affordable Care Act"), in ways that force Plaintiffs and thousands of other individuals to violate their deepest held religious beliefs.

2. The Armstrong family (Plaintiffs W. L. (Bill) Armstrong, William L. (Wil) Armstrong III (son of Plaintiff W. L. (Bill) Armstrong), and Plaintiff Dorothy A. Shanahan (sister of Plaintiff W. L. (Bill) Armstrong)) (herein the "Armstrong Plaintiffs") and the May family (Plaintiffs Jeffrey S. May and John A. May (father of Plaintiff Jeffrey S. May)) (herein the "May Plaintiffs") comprise all of the voting shareholders of Plaintiff Cherry Creek Mortgage Co., Inc. which is organized as an S Corporation pursuant to the Internal Revenue Code ("IRC").

3. Plaintiff Cherry Creek Mortgage Co., Inc. is a full-service residential mortgage banking company, headquartered in Greenwood Village, CO. It is licensed to do business in 27 states and employs a total 730 employees.

4. Plaintiffs provide group health insurance through Plaintiff Cherry Creek Mortgage Co., Inc. to employees and their dependents. Approximately 400 employees (and their dependents) of Plaintiff Cherry Creek Mortgage Co., Inc. are currently covered by this group health

2

insurance plan. Each of the members of the Armstrong Plaintiffs and the May Plaintiffs are believing and practicing Evangelical Christian and each believes the Holy Bible is the inspired, inerrant Word of God and that the Holy Bible instructs that each human life, which begins at conception, is created in God's image, that God mandates respect for the sanctity of each human life, and that abortion and abortion-inducing drugs result in the wrongful taking of a human life.

5. With significant exceptions, all group health plans and health insurance issuers that offer non-grandfathered group or individual health coverage must provide coverage for certain preventive services without cost-sharing. 42 U.S.C. § 300gg-13. These services have been defined by the Health Resources and Services Administration ("HRSA") to include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures and patient education and counseling for all women with reproductive capacity." HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines/ (referred to hereinafter the "HHS Mandate").

6. In the category of "FDA-approved contraceptives" included in this HHS Mandate are several drugs or devices that may cause the demise of an already-conceived but not-yet- implanted human embryo, such as "emergency contraception" or "Plan B" drugs (the so-called "morning after" pill) and "ella" (the so-called "week after" pill) which studies show can function to kill embryos even after they have implanted in the uterus by a mechanism similar to the abortion drug RU-486.

7. Over the last several months, the Armstrong Plaintiffs and the May Plaintiffs have become aware that many citizens of the United States who hold the same or similar religious beliefs as do the Armstrong Plaintiffs and the May Plaintiffs have, as a result of such religious

beliefs, challenged the application of the HHS Mandate to them and to their for-profit businesses.

8. In late December 2012, the Armstrong Plaintiffs and the May Plaintiffs discovered that the health insurance plan offered by Plaintiff Cherry Creek Mortgage Co., Inc. to its employees and their dependants (approximately 400 employees) covered "FDA-approved contraceptives." The Armstrong Plaintiffs and the May Plaintiffs did not understand, until late December 2012, that "FDA-approved contraceptives" included abortion-inducing drugs.

9. The Armstrong Plaintiffs and the May Plaintiffs immediately voiced their religious objections to Plaintiff Cherry Creek Mortgage Co., Inc.'s insurer to providing insurance coverage for abortion-inducing drugs. The Armstrong Plaintiffs and the May Plaintiffs were informed by the insurer that, while the insurer had failed to inform the Armstrong Plaintiffs and the May Plaintiffs of this added coverage, Plaintiff Cherry Creek Mortgage Co., Inc.'s insurance plan covered "FDA-approved contraceptives" and that such "approved contraceptives" indeed included Plan B drugs and ella, drugs that are, in fact, abortion-inducing drugs.

10. The Armstrong Plaintiffs and the May Plaintiffs thereupon instructed the insurer to omit coverage of such abortion-inducing drugs from Plaintiff Cherry Creek Mortgage Co., Inc.'s employee health insurance plan. The insurer thereupon informed the Armstrong Plaintiffs and the May Plaintiffs that, without injunctive relief from this Court, the insurer was required to comply with the HHS Mandate and must include such abortion-inducing drugs in Plaintiff Cherry Creek Mortgage Co., Inc.'s group health insurance plan.

11. Because there was not time in late December 2012 to seek judicial relief, on and after January 1, 2013, without any viable option, the Armstrong Plaintiffs, the May Plaintiffs, and

4

Plaintiff Cherry Creek Mortgage Co., Inc. were forced, at least temporarily, to comply with the HHS Mandate or face the threat of heavy fines and penalties. The Armstrong Plaintiffs, the May Plaintiffs, and Plaintiff Cherry Creek Mortgage Co., Inc. are currently exploring ways of eliminating such objectionable abortion-inducing drugs from their employee health insurance plan.

12. The HHS Mandate also forces the Armstrong Plaintiffs, the May Plaintiffs, and Plaintiff Cherry Creek Mortgage Co., Inc. to fund government-dictated speech, to wit: education and counseling about abortion-inducing drugs, that is directly at odds with the deeply held religious beliefs that they strive to embody in the management and operation of Plaintiff Cherry Creek Mortgage Co., Inc.

13. In that the HHS Mandate is a substantial burden on Plaintiffs' religious exercise, Defendants' refusal to accommodate the religious and conscience objections of the Armstrong Plaintiffs, the May Plaintiffs, and Plaintiff Cherry Creek Mortgage Co., Inc. and other similarly situated individuals and for-profit business entities is highly selective.

14. The Affordable Care Act exempts a wide variety of health insurance plans from the HHS Mandate and, upon information and belief, the Defendants and other government officials have provided thousands of exemptions or waivers from the Affordable Care Act for various other entities, such as large corporations.[1] But Defendants' HHS Mandate does not exempt Plaintiffs' employee health insurance plan or those of many other religious Americans.

15. Defendants' actions violate Plaintiffs' right freely to exercise religion protected by the RFRA and the Religion Clauses of the First Amendment to the United States Constitution.

---

[1] Judge Kane estimated that "191 million Americans belong to plans which may be grandfathered under the ACA." *Newland v. Sebelius,* 2012 U.S. Dist. LEXIS 104835 at *4 (D. Colo. July 27, 2012); accord *Tyndale House Publ'rs. V. Sebelius,* 2012 U.S. Dist. LEXIS 163965 at *57-61 (D.D.C. Nov 16, 2012).

16. Defendants' actions also violate Plaintiffs' right to the freedom of speech as secured by the Free Speech Clause of the First Amendment to the United States Constitution.

17. Additionally, Defendants have violated the Administrative Procedure Act, 5 U.S.C. § 553, by imposing the HHS Mandate without prior notice or public comment, and for other reasons as described herein.

18. Plaintiffs are now being harmed by Defendants' HHS Mandate. The HHS Mandate by its terms forces Plaintiffs to obtain and pay for insurance coverage of the objectionable items in their January 1, 2013 employee health insurance plan and in succeeding year's plans without relief from this Court.

19. Absent immediate injunctive relief from this Court, by virtue of the number of full-time employees employed by Plaintiffs, Plaintiffs must either continue to comply with the HHS Mandate by being illegally and unconstitutionally coerced into violating their sincerely held religious beliefs or face the threat of heavy fines and penalties.

20. The HHS Mandate forces Plaintiffs to fund government-dictated speech concerning education and counseling related to abortion-inducing drugs that is directly at odds with Plaintiffs' deeply held religious beliefs and the moral ethics Plaintiffs strive to embody in Plaintiff Cherry Creek Mortgage Co., Inc.

21. Defendants' coercion tramples on the freedom of conscience of Plaintiffs and of millions of other Americans who seek to abide by their religious convictions in their lives and in their businesses, to comply with moral imperatives decreed by God in Scripture, and to participate in the public square through their businesses and other activities in a way that is consistent with their deeply held religious beliefs and the ethical imperatives decreed by God.

22. Defendants' actions violate Plaintiffs' right to freely exercise their religion, rights protected by the Religion Clauses of the First Amendment to the United States Constitution, rights secured by the Free Speech Clause of the First Amendment to the United States Constitution, and rights protected by the Religious Freedom Restoration Act.

23. Additionally, Defendants' actions have violated the Administrative Procedure Act, 5 U.S.C. § 553, by imposing the HHS Mandate on Plaintiffs and other Americans without prior notice or public comment, and for other reasons alleged herein.

24. Plaintiffs are faced with immediate, imminent, continuing, and irreparable harm due to Defendants' HHS Mandate which, by its terms, forces Plaintiffs to obtain and pay for insurance coverage for objectionable abortion-inducing drugs and related education and counseling in their employee health insurance plan on and after January 1, 2013.

25. Plaintiffs therefore will continue to suffer irreparable harm unless and until this Court enters declaratory and injunctive relief to protect Plaintiffs from Defendants' deliberate attack on Plaintiffs' consciences, religious freedoms, and speech freedoms which result from continued forced compliance with the HHS Mandate.

## PARTIES

26. Plaintiff W. L. (Bill) Armstrong is an individual, resident in Arapahoe County, CO and, along with the other members of the Armstrong Plaintiffs and the May Plaintiffs, is one of the five voting shareholders of Plaintiff Cherry Creek Mortgage Co., Inc., a Colorado corporation. Plaintiff W. L. (Bill) Armstrong is also a member of the board of directors of Plaintiff Cherry Creek Mortgage Co., Inc. His business address is 7600 E. Orchard Road, Suite 250-N, Greenwood Village, CO 80111.

27. Plaintiff Jeffrey S. May is an individual, resident in Arapahoe County, CO and, along with the other members of the Armstrong Plaintiffs and the May Plaintiffs, is one of the five voting shareholders of Plaintiff Cherry Creek Mortgage Co., Inc., a Colorado corporation. Plaintiff Jeffrey S. May is also a member of the board of directors and President & CEO of Plaintiff Cherry Creek Mortgage Co., Inc. His business address is 7600 E. Orchard Road, Suite 250-N, Greenwood Village, CO 80111.

28. Plaintiff William L. (Wil) Armstrong III is an individual, resident in Arapahoe County, CO and, along with the other members of the Armstrong Plaintiffs and the May Plaintiffs, is one of the five voting shareholders of Plaintiff Cherry Creek Mortgage Co., Inc., a Colorado corporation. Plaintiff Wil Armstrong III is also a member of the board of directors and Chairman of the Board of Directors of Plaintiff Cherry Creek Mortgage Co., Inc. His business address is 7600 E. Orchard Road, Suite 250-N, Greenwood Village, CO 80111.

29. Plaintiff John A. May is an individual, resident in Broomfield County, CO and, along with the other members of the Armstrong Plaintiffs and the May Plaintiffs is, one of the five voting shareholders of Plaintiff Cherry Creek Mortgage Co., Inc., a Colorado corporation. His business address is 7600 E. Orchard Road, Suite 250-N, Greenwood Village, CO 80111.

30. Plaintiff Dorothy A. Shanahan is an individual, resident in Douglas County, CO and, along with the other members of the Armstrong Plaintiffs and the May Plaintiffs, is one of the five voting shareholders of Plaintiff Cherry Creek Mortgage Co., Inc., a Colorado corporation. Ms. Shanahan owns her shares as Trustee of the Dorothy Ann Shanahan Trust, a revocable trust dated August 13, 1980. Her business address is 7600 E. Orchard Road, Suite 250-N, Greenwood Village, CO 80111.

31. Plaintiff Cherry Creek Mortgage Co., Inc. is a Colorado corporation in good standing and operating as an S-Corporation pursuant to the Internal Revenue Code. It's Articles of Incorporation, filed with the Colorado Secretary of State on October 20, 1986 (ID# 19871693857) provide, among other things, that Plaintiff Cherry Creek Mortgage Co., Inc. "is organized [for] the transaction of all lawful business for which corporations may be incorporated pursuant to the Colorado Corporation Code . . . [,] shall have all of the rights, privileges and powers now or hereafter conferred upon corporations by the Colorado Corporation Code . . . [and] may exercise all powers necessary or convenient to effect any of the purposes for which the corporation has been organized." The business address of Plaintiff Cherry Creek Mortgage Co., Inc. is 7600 E. Orchard Road, Suite 250-N, Greenwood Village, CO 80111.

32. Defendants are appointed officials of the United States government and United States Executive Branch agencies responsible for issuing and enforcing the HHS Mandate.

33. Defendant Kathleen Sebelius (herein "Sebelius") is the Secretary of the United States Department of Health and Human Services (herein "HHS"). In that capacity, she is responsible for the operation and management of HHS. Sebelius is sued in her official capacity only.

34. Defendant HHS is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the HHS Mandate.

35. Defendant Seth D. Harris (herein "Harris") is the Acting Secretary of the United States Department of Labor (herein "DOL"). In that capacity, he is responsible for the operation and management of DOL. Harris is sued in his official capacity only.

36. Defendant DOL is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the HHS Mandate.

37. Defendant Jacob J. Lew (herein "Lew") is the Secretary of the United States Department of the Treasury (herein "Treasury"). In that capacity, he is responsible for the operation and management of Treasury. Lew is sued in his official capacity only.

38. Defendant Treasury is an executive agency of the United States government and is responsible for the promulgation, administration, and enforcement of the HHS Mandate.

## JURISDICTION AND VENUE

39. This action arises under the Constitution and laws of the United States. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361; jurisdiction to render declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 2000bb-1, 5 U.S.C. § 702, and Fed. R. Civ. P. 65; and authority to award reasonable attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and 42 U.S.C. § 1988.

40. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e). A substantial part of the events or omissions giving rise to this Verified Complaint occurred in this district and all of the Plaintiffs are domiciled and/or resident in this district.

## FACTUAL ALLEGATIONS

41. Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

### I.    Plaintiffs' Religious Beliefs

42. Each of the members of the Armstrong Plaintiffs and the May Plaintiffs are believing and practicing Evangelical Christian and each believes that the Holy Bible is the inspired, inerrant Word of God and that the Holy Bible instructs that each human life, which begins at

conception, is created in God's image, that God mandates respect for the sanctity of each human life, and that abortion and abortion-inducing drugs result in the wrongful taking of a human life.

43. As a result, the Armstrong Plaintiffs and the May Plaintiffs run Plaintiff Cherry Creek Mortgage Co., Inc. in accord with these sincerely held religious beliefs and have adopted, as the following as the mission or purpose statement of Plaintiff Cherry Creek Mortgage Co., Inc., to wit:

> **OUR PURPOSE IS TO BUILD AND BECOME A GREAT COMPANY AND IN THIS PROCESS WE ASPIRE TO POSITIVELY IMPACT THE LIVES OF THOSE INDIVIDUALS WHO COME INTO CONTACT WITH OUR ORGANIZATION AND TO HONOR GOD IN ALL WE DO.**

44. This mission statement appears in Plaintiff Cherry Creek Mortgage Co., Inc. publications (see, e.g., attached Exhibit A), employee training manuals (see, e.g., attached Exhibit B), on a wallet-sized plastic card provided to new employees (see attached Exhibit C; Exhibit C is an enlarged copy of the wallet-sized card) and on a sign mounted on the wall in Plaintiff Cherry Creek Mortgage Co., Inc.'s employee training room wherein each month new employees are introduced to Plaintiff Cherry Creek Mortgage Co., Inc. and to its mission statement, including Cherry Creek Mortgage Co., Inc.'s primary goal "to honor God in all that we do" by, among others, Plaintiff Cherry Creek Mortgage Co., Inc. president & CEO Plaintiff Jeffrey S. May and by Stacy Harding, Senior Vice President, Plaintiff Cherry Creek Mortgage, Co., Inc.

45. One of the religious and moral teachings which each of the members of the Armstrong Plaintiffs and the May Plaintiffs embraces, based on the Holy Bible, is that a preborn child is,

from the moment of conception, *i.e.*, a fertilized human embryo, a human being created in the image of God.  See, *e.g.,* Ps. 51:5; 139:13; Luke 1:41-44; 18:15; 2 Tim. 3:15.

46. Based on these religious and moral teachings, the Armstrong Plaintiffs and the May Plaintiffs sincerely believe that the termination of the life of a preborn child by, among other ways, abortion-inducing drugs is an intrinsic evil and a sin against God. Therefore, abortion and any abortion-inducing drugs that may terminate the life of a fertilized embryo are morally wrong and objectionable to each of the members of the Armstrong Plaintiffs and the May Plaintiffs.

47. The members of the Armstrong Plaintiffs and the May Plaintiffs are all of the voting shareholders of Plaintiff Cherry Creek Mortgage Co., Inc. and, as such, are solely responsible for the management and operation of Plaintiff Cherry Creek Mortgage Co., Inc. They seek to conduct the business operations of Plaintiff Cherry Creek Mortgage Co., Inc. with integrity, in compliance with their pro-life beliefs, and in a manner that honors God.

48. Consequently, each of the members of the Armstrong Plaintiffs and the May Plaintiffs believes that it would be immoral and sinful for Plaintiff Cherry Creek Mortgage Co., Inc. to be required to continue to participate in, pay for, facilitate, or otherwise support abortion-inducing drugs and to provide the related education and counseling as is required by the HHS Mandate.

49. Collectively, the members of the Armstrong Plaintiffs and the May Plaintiffs have demonstrated their sincerely held religious beliefs by, among other ways, contributing millions of dollars to Evangelical Christian and pro-life causes over at least the last twenty (20) years.

## II. Plaintiffs' Health Insurance Plan

50. As part of fulfilling their organizational mission and Evangelical Christian beliefs and
    commitments, the Armstrong Plaintiffs and the May Plaintiffs, through Plaintiff Cherry
    Creek Mortgage Co., Inc., provide generous health insurance coverage for their employees
    and their dependants through CIGNA, a health benefits insurer.

51. Plaintiff Cherry Creek Mortgage Co., Inc. employs approximately 730 full-time employees
    throughout its various locations. At present, 400 of these employees (and their dependants)
    are health insurance plan participants.

52. The plan year for Plaintiff Cherry Creek Mortgage Co., Inc.'s insurance plan begins on
    January 1 of each year. The current plan began on January 1, 2013. The insurance plan is
    thus renewed on January 1 of each year.

53. The Armstrong Plaintiffs and the May Plaintiffs did not discover until late December 2012
    that the health insurance plan offered by Plaintiff Cherry Creek Mortgage Co., Inc. to its
    employees and their dependants covered "FDA-approved contraceptives" and that "FDA-
    approved contraceptives" included both (a) "contraceptives" which prevented contraception,
    to which the Armstrong Plaintiffs and the May Plaintiffs do not object, and (b) Plan B drugs
    and ella, drugs which are, in fact, abortion-inducing drugs, and intrauterine devices which
    also is an abortion-inducing device, to which the Armstrong Plaintiffs and the May Plaintiffs
    do vigorously object on religious grounds.

54. The Armstrong Plaintiffs and the May Plaintiffs thereupon instructed their insurer to omit
    coverage of such abortion-inducing drugs from Plaintiff Cherry Creek Mortgage Co., Inc.'s
    insurance plan. The insurer thereupon informed the Armstrong Plaintiffs and the May
    Plaintiffs that, without injunctive relief from this Court, the insurer was required to comply

with the HHS Mandate and to include such abortion-inducing drugs in Plaintiff Cherry Creek Mortgage Co., Inc.'s group health insurance plan.

55. Because there was not time in late December 2012 to seek judicial relief relating to the plan beginning on and after January 1, 2013, without any viable option, the Armstrong Plaintiffs, the May Plaintiffs, and Plaintiff Cherry Creek Mortgage Co., Inc. were forced to comply with the HHS Mandate or face the threat of heavy fines and penalties.

56. The Armstrong Plaintiffs, the May Plaintiffs, and Plaintiff Cherry Creek Mortgage Co., were also forced, on and after January 1, 2013, to fund government-dictated speech that is directly at odds with the deeply held religious beliefs.

57. The company that provides health insurance to Plaintiff Cherry Creek Mortgage Co., Inc., i.e. CIGNA, has informed the Armstrong Plaintiffs and the May Plaintiffs that, upon the issuance of injunctive relief by this Court, the insurer will immediately remove abortion-inducing drugs from plan coverage.

## III. The Affordable Care Act and the HHS Mandate

58. Under the Affordable Care Act, employers with over 50 full-time employees are required to provide a certain minimum level of health insurance to their employees.

59. On February 15, 2012, the Defendants issued final rules through the Departments of HHS, Labor, and Treasury entitled "Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act," 77 Fed. Reg. 8725-30 that forces Plaintiffs to pay for and otherwise facilitate the insurance coverage and use of abortion-inducing drugs and related education and counseling.

60. This final rule was adopted without giving due weight to the tens of thousands of public comments submitted to the Defendants in opposition to the HHS Mandate.

14

61. With significant exceptions, these final rules require that all group health plans and health insurance issuers that offer non-grandfathered group or individual health coverage must provide coverage for "preventive services," *i.e.,* contraception drugs, abortion-inducing drugs, and education and counseling related to these drugs, all of which must be offered with no cost-sharing by the covered employee. 42 U.S.C. § 300gg-13.

62. These services have been defined by the Health Resources and Services Administration ("HRSA"), based on recommendations from the Institute of Medicine, to include "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures and patient education and counseling for all women with reproductive capacity." HRSA, Women's Preventive Services: Required Health Plan Coverage Guidelines, http://www.hrsa.gov/womensguidelines/ (referred to herein as the "HHS Mandate").

63. In the category of "FDA-approved contraceptives" included in this HHS Mandate are several drugs or devices that are not truly "contraceptives" but may cause the demise of an already-conceived but not-yet- implanted human embryo, such as "emergency contraception" or "Plan B" drugs (the so-called "morning after" pill).

64. Another "FDA-approved contraceptive" in this same category is a drug called "ella" (the so-called "week after" pill) which studies show can function to kill human embryos even after the human embryo has implanted in the uterus by a mechanism similar to the abortion drug RU-486.

65. The manufacturers of these abortion-inducing drugs, methods and devices in the category of "FDA-approved contraceptives" indicate on product labeling that these drugs can function to cause the demise of a human embryo.

66. The HHS Mandate also requires group health care plans to pay for the provision of counseling, education, and other information concerning contraception (including devices and drugs such as Plan B and ella that cause early abortion or harm to human embryos) and sterilization for all women beneficiaries who are capable of bearing children.

67. The HHS Mandate applies not only to sponsors of group health plans such as employers who provide self-insurance, but also to issuers of insurance such as the issuer which provides health insurance to Plaintiff Cherry Creek Mortgage Co., Inc., to wit: CIGNA. Accordingly, Plaintiffs cannot avoid the HHS Mandate by shopping for an insurance plan that accommodates their right of conscience because the Administration has intentionally foreclosed that possibility.

68. The HHS Mandate applies to the first health insurance plan-year beginning after August 1, 2012.

69. The HHS Mandate currently offers the possibility of a narrow exemption to religious employers, but only if such religious employer meets all of the following requirements: (1) the religious employer has the inculcation of religious values as its purpose; (2) the religious employer primarily employs persons who share its religious tenets; (3) the religious employer primarily serves persons who share its religious tenets; and (4) the religious employer is a nonprofit organization described in section 6033(a)(1) and (a)(3)(A)(i) or (iii) of the IRC. Section 6033(a)(3)(A)(i) and (iii) of the IRC refers to churches, their integrated auxiliaries, and conventions or associations of churches, as well as to the exclusively religious activities of any religious order.

70. President Obama held a press conference on February 10, 2012, and later (through Defendants) issued an "Advanced Notice of Proposed Rulemaking" ("ANPRM") on March

21, 2012 (77 Fed. Reg. 16501–08), claiming to offer a "compromise" under which some

religious non-profit organizations not meeting the above definition would still have to

comply with the HHS Mandate, but by means of the employer's insurer offering the

employer's employees the same coverage for "free."[2]

71. On February 10, 2012 a document was also issued from the Center for Consumer

Information and Insurance Oversight (CCIIO), Centers for Medicare & Medicaid Services

(CMS), of HHS, entitled "Guidance on the Temporary Enforcement Safe Harbor for Certain

Employers, Group Health Plans and Group Health Insurance Issuers with Respect to the

Requirement to Cover Contraceptive Services Without Cost Sharing Under Section 2713 of

the Public Health Service Act, Section 715(a)(1) of the Employee Retirement Income

Security Act, and Section 9815(a)(1) of the Internal Revenue Code."

72. Under this "Guidance," an organization that truthfully declares "I certify that the

organization is organized and operated as a non-profit entity; and that, at any point from

February 10, 2012 onward, contraceptive coverage has not been provided by the plan,

consistent with any applicable State law, because of the religious beliefs of the organization,"

and that provides a specified notice to plan participants, will not "be subject to any

enforcement action by the Departments for failing to cover recommended contraceptive

services without cost sharing in non-exempted, non-grandfathered group health plans

---

[2] On February 1, 2013, the Defendants proposed another rule which purportedly, if adopted, will broaden this narrow exemption to religious employers. In fact, this new proposed exemption covers only a sliver of religious organizations. As before, it cross-references and relies upon an unrelated section in the IRC that exempts certain church-related organizations covered by the unrelated section and therefore, by this new, proposed exemption, which does not become effective, if at all, until on or about August 1, 2013, are (i) churches, (ii) conventions or associations of churches, (iii) integrated auxiliaries of churches (e.g., organizations that are affiliated with and predominantly supported by a church such as a food pantry that is controlled and funded by a church), and (iv) religious orders (e.g., monks or missionaries such as the Jesuits). This proposed new rule does not apply to Plaintiffs or other for-profit entities. Like its predecessor, the proposal is neither a rule, a proposed rule, nor the specification of what a rule proposed in the future would actually contain. It in no way changes or alters the final status of the February 15, 2012 HHS Mandate. It does not even create a legal requirement that Defendants change the HHS Mandate at some time in the future.

established or maintained by an organization, including a group or association of employers within the meaning of section 3(5) of ERISA, (and any group health insurance coverage provided in connection with such plans)," until "the first plan year that begins on or after August 1, 2013."

73. Neither of these "compromises" is helpful to Plaintiffs because, among other reasons, Plaintiff Cherry Creek Mortgage Co., Inc. is not a non-profit entity. Therefore, while the Defendants' most recent "compromise" purports to accommodate the religious beliefs of even more religious non-profits beyond the HHS Mandate's initial religious exemption for churches, none of these measures will stop the HHS Mandate from continuing to impose its requirements on Plaintiffs' plan year on and after January 1, 2013.

74. As Plaintiffs' health insurance plan does not qualify for grandfathered status, Plaintiffs were mandated to comply with the HHS Mandate's requirement of coverage of abortion-inducing drugs and related education and counseling starting in Plaintiffs' January 1, 2013 plan.

75. The HHS Mandate makes no allowance for the religious freedom of individuals and the for-profit entities they own and operate, including the Armstrong Plaintiffs, the May Plaintiffs, and Plaintiff Cherry Creek Mortgage Co., Inc., when such individuals object, on sincerely held religious bases, to paying for or providing insurance coverage for abortion-inducing drugs.

76. A for-profit entity cannot freely avoid the HHS Mandate by simply refusing to provide health insurance to its employees, because the Affordable Care Act imposes significant monetary penalties on entities that would so refuse.

77. The exact magnitude of these penalties may vary according to the complicated provisions of the Affordable Care Act, but the fine is approximately $2,000 per employee per year, *i.e.*,

estimated to be about $1,400,000 per year potential fine to Plaintiff Cherry Creek Mortgage Co., Inc.

78. The Affordable Care Act also imposes monetary penalties if Plaintiffs were to continue to omit abortion-inducing drugs from their health insurance plan.

79. The exact magnitude of these penalties may vary according to the complicated provisions of the Affordable Care Act, but the fine is approximately $100 per day per employee, with minimum amounts applying in different circumstances *i.e.,* estimated to be about $25,500,000 per year potential fine to Plaintiff Cherry Creek Mortgage Co., Inc.

80. The imposition of such fines would drive Plaintiff Cherry Creek Mortgage Co., Inc. out of business to the detriment of, among others, its 730 employees.

81. If Plaintiffs do not continue to submit to the HHS Mandate they also trigger a range of enforcement mechanisms, including but not limited to civil actions by the Secretary of Labor or by plan participants and beneficiaries, which would include, but not be limited to, relief in the form of judicial orders mandating that Plaintiffs violate their sincerely held religious beliefs and provide coverage for abortion-inducing drugs to which they religiously object.

82. The HHS Mandate imposes no constraint on the government's discretion to grant exemptions to some, all, or none of the organizations meeting the HHS Mandate's definition of "religious employers."

83. Plaintiffs are not "religious" enough under this definition in several respects, including but not limited to because they have purposes other than the "inculcation of religious values," they do not primarily hire or serve Christians, and because Plaintiff Cherry Creek Mortgage Co. Inc., though an S Corporation, is a for profit entity and not a church, integrated auxiliary

of a particular church, convention or association of a church, or the exclusively religious activity of a religious order.

84. The HHS Mandate fails to protect the statutory and constitutional conscience rights of religious Americans like the Armstrong Plaintiffs and the May Plaintiffs even though those rights were repeatedly raised in the public comments and can be expected to be raised yet again in the most recent "compromise."

85. The HHS Mandate requires that the Armstrong Plaintiffs and the May Plaintiffs to provide coverage for abortion-inducing drugs and to provide compelled speech, i.e., related education and counseling, through Plaintiff Cherry Creek Mortgage Co., Inc. against their consciences and in violation of their religious beliefs and in a manner that is contrary to law.

86. The HHS Mandate constitutes government-imposed coercion on Plaintiffs to either change their sincerely held religious beliefs or continue to violate their sincerely held religious beliefs so as to avoid massive fines and penalties.

87. The HHS Mandate imposes a burden on the Plaintiffs' employee recruitment and retention efforts by creating uncertainty as to whether or on what terms Plaintiff Cherry Creek Mortgage Co., Inc. will be able to offer health insurance different from or beyond the HHS Mandate's effect or whether Plaintiff Cherry Creek Mortgage Co., Inc. and thus the Armstrong Plaintiffs and the May Plaintiffs, as voting shareholders of an S Corporation will suffer penalties therefrom.

88. The HHS Mandate places the Armstrong Plaintiffs, the May Plaintiffs, and Plaintiff Cherry Creek Mortgage Co., Inc. at a competitive disadvantage in their efforts to recruit and retain employees.

89. The Armstrong Plaintiffs and the May Plaintiffs have sincere conscientious religious objections to providing coverage for abortion-inducing drugs and related education and counseling through their S Corporation, Plaintiff Cherry Creek Mortgage Co. Inc.

90. The HHS Mandate does not apply equally to all religious adherents or groups.

91. The Affordable Care Act and the HHS Mandate are not generally applicable because they provide for numerous "exemptions" from their rules, many of which have already been granted to other businesses and entities by the Defendants.

92. For instance, the HHS Mandate does not apply to members of a "recognized religious sect or division" that conscientiously object to acceptance of public or private insurance funds. See 26 U.S.C. §§ 5000A(d)(2)(a)(i) and (ii). Plaintiffs do not meet this exemption.

93. In addition, as described above, the HHS Mandate exempts certain churches narrowly considered to be religious employers. Plaintiffs do not meet this exemption.

94. Furthermore, the Affordable Care Act creates a system of individualized "exemptions" because, under the Affordable Care Act's authorization, the federal government has granted discretionary compliance waivers to a variety of for profit businesses, including large businesses, for purely secular or political reasons. Plaintiffs have not been granted any such exemption.

95. The HHS Mandate does not apply to employers with preexisting plans that are "grandfathered." Plaintiffs' plan is not grandfathered under the Affordable Care Act.

96. The HHS Mandate does not apply through the employer mandate to employers having fewer than 50 full-time employees. Plaintiffs, employing more than 50 full-time employees, do not meet this exemption.

97. Unless relief issues from this Court, Plaintiffs will be forced to continue to comply with the HHS Mandate for the January 1, 2013 plan year and thereafter.

98. The HHS Mandate will have a profound and adverse effect on Plaintiffs and how they negotiate contracts and compensate their employees.

99. The HHS Mandate will make it difficult for Plaintiffs to attract quality employees because of uncertainty about health insurance benefits.

100. Any alleged interest Defendants have in providing free FDA-approved abortion-inducing drugs and related education and counseling without cost-sharing by plan participants could be advanced through other, more narrowly tailored mechanisms that do not burden the religious beliefs of Plaintiffs and do not require them to provide or facilitate coverage of such abortion-inducing drugs and related education and counseling through their health insurance plan.

101. Without immediate injunctive and declaratory relief as requested herein, Plaintiffs are suffering and will continue to suffer irreparable harm.

102. Plaintiffs have no adequate remedy at law.

## FIRST CLAIM FOR RELIEF
### (Violation of the Religious Freedom Restoration Act
### 42 U.S.C. § 2000bb)

103. Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

104. Plaintiffs' sincerely held religious beliefs prohibit them from providing coverage for abortion-inducing drugs and related education and counseling in Plaintiff Cherry Creek Mortgage Co., Inc.'s employee health insurance plan.

105.    When Plaintiffs comply with their sincerely held religious biblical beliefs on abortion-
        inducing drugs and related education and counseling, they exercise religion within the
        meaning of the Religious Freedom Restoration Act.

106.    The HHS Mandate imposes a substantial burden on Plaintiffs' religious exercise and
        coerces them to change or violate their sincerely held religious beliefs.

107.    The HHS Mandate chills Plaintiffs' religious exercise within the meaning of RFRA.

108.    The HHS Mandate exposes Plaintiffs to substantial fines and/or financial burdens for
        their religious exercise if they fail and refuse to comply with the HHS Mandate.

109.    The HHS Mandate exposes Plaintiffs to substantial competitive disadvantages because of
        uncertainties about their health insurance benefits caused by the HHS Mandate.

110.    The HHS Mandate furthers no compelling governmental interest and is not narrowly
        tailored to any compelling governmental interest.

111.    The HHS Mandate is not the least restrictive means of furthering Defendants' stated
        interests.

112.    The HHS Mandate violates RFRA.

        WHEREFORE, the Plaintiffs pray for the relief set forth below.

### SECOND CLAIM FOR RELIEF
### (Violation of Free Exercise Clause of the First Amendment
### to the United States Constitution)

113.    Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

114.    Plaintiffs' sincerely held religious beliefs prohibit them from providing coverage for
        abortion-inducing drugs and related education and counseling in Plaintiff Cherry Creek
        Mortgage Co., Inc.'s employee health insurance plan.

115.    When Plaintiffs comply with their sincerely held religious beliefs on abortion-inducing

drugs and related education and counseling, they exercise religion within the meaning of the

Free Exercise Clause.

116.    The HHS Mandate is not neutral and is not generally applicable.

117.    Defendants have created categorical "exemptions" and individualized "exemptions" to

the HHS Mandate.

118.    The HHS Mandate furthers no compelling governmental interest.

119.    The HHS Mandate is not the least restrictive means of furthering Defendants' stated

interests.

120.    The HHS Mandate coerces Plaintiffs to change or violate their sincerely held religious

beliefs.

121.    The HHS Mandate chills Plaintiffs' religious exercise.

122.    The HHS Mandate exposes Plaintiffs to substantial fines and/or financial burdens for

their religious exercise.

123.    The HHS Mandate exposes Plaintiffs to substantial competitive disadvantages because of

uncertainties about its health insurance benefits caused by the HHS Mandate.

124.    The HHS Mandate imposes a substantial burden on Plaintiffs' religious exercise.

125.    The HHS Mandate is not narrowly tailored to any compelling governmental interest.

126.    By design, Defendants framed the HHS Mandate to apply to some religious Americans

but not to others, resulting in discrimination among religions.

127.    Defendants have created exemptions to the HHS Mandate for some religious believers

but not others based on characteristics of their beliefs and their religious exercise.

128. Defendants designed the HHS Mandate, the religious exemption thereto, and the "compromise" and guidance allowances thereto, in a way that makes it impossible for Plaintiffs and other similar religious Americans to comply with their sincerely held religious beliefs.

129. Defendants promulgated both the HHS Mandate and the religious exemption/allowances with the purpose and intent to suppress the religious exercise of Plaintiffs and others.

130. The HHS Mandate violates Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

WHEREFORE, the Plaintiffs pray for the relief set forth below.

## THIRD CLAIM FOR RELIEF
### (Violation of the Establishment Clause of the First Amendment to the United States Constitution)

131. Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

132. The First Amendment's Establishment Clause prohibits the establishment of any religion and/or excessive government entanglement with religion.

133. To determine whether religious persons or entities like Plaintiffs are required to comply with the HHS Mandate, are required to continue to comply with the HHS Mandate, are eligible for an exemption or other accommodations, or continue to be eligible for the same, Defendants must examine the religious beliefs and doctrinal teachings of persons or entities like Plaintiffs.

134. Obtaining sufficient information for the Defendants to analyze the content of Plaintiffs' sincerely held religious beliefs requires ongoing, comprehensive government surveillance that impermissibly entangles Defendants with religion and results in the non-neutral treatment of religions.

135.    The HHS Mandate discriminates among religions and among denominations, favoring

some over others, and exhibits a hostility to religious beliefs and/or an excessive

entanglement with religion.

136.    The HHS Mandate adopts a particular theological view of what is acceptable moral

complicity in provision of abortion-inducing drugs and related education and counseling and

imposes it upon all religionists who must either conform their consciences to the HHS

Mandate or suffer the penalties.

137.    The HHS Mandate violates Plaintiffs' rights secured to them by the Establishment Clause

of the First Amendment of the United States Constitution.

WHEREFORE, the Plaintiffs pray for the relief set forth below.

## FOURTH CLAIM FOR RELIEF
### (Violation of the Free Speech Clause of the First Amendment
to the United States Constitution)

138.    Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

139.    Defendants' requirement of knowingly providing insurance coverage for abortion-

inducing drugs pursuant to the HHS Mandate also requires Plaintiffs to provide related

education and counseling, i.e., expressive speech, and thus forces Plaintiffs to speak in a

manner contrary to their religious beliefs.

140.    Defendants have no narrowly tailored compelling interest to justify this compelled

speech.

141.    The HHS Mandate therefore violates Plaintiffs' rights secured to them by the Free

Speech Clause of the First Amendment of the United States Constitution.

WHEREFORE, the Plaintiffs pray for the relief set forth below.

## FIFTH CLAIM FOR RELIEF
### (Violation of the Administrative Procedure Act)

142.   Plaintiffs reallege all matters set forth above and incorporate them herein by reference.

143.   Because they did not give proper notice and an opportunity for public comment,
       Defendants did not take into account the full implications of the regulations by completing a
       meaningful consideration of the relevant matter presented.

144.   Defendants did not consider or respond to the voluminous comments they received in
       opposition to the interim final rule.

145.   Therefore, Defendants have taken agency action not in accordance with procedures
       required by law, and Plaintiffs are entitled to relief pursuant to 5 U.S.C. § 706(2)(D).

146.   In promulgating the HHS Mandate, Defendants failed to consider the constitutional and
       statutory implications of the HHS Mandate on Plaintiffs and similar persons.

147.   Defendants' explanation (and lack thereof) for its decision not to exempt Plaintiffs and
       similarly situated religionists and their entities from the HHS Mandate runs counter to the
       evidence submitted by religious Americans during the comment period.

148.   Thus, Defendants' issuance of the HHS Mandate was arbitrary and capricious within the
       meaning of 5 U.S.C. § 706(2)(A) because the HHS Mandate fails to consider the full extent
       of its implications and it does not take into consideration the evidence against it.

149.   As set forth above, the HHS Mandate violates RFRA and the First and Fifth Amendments
       to the United States Constitution.

150.   The HHS Mandate is also contrary to the provisions of the Affordable Care Act which
       state that "nothing in this title"—*i.e.*, title I of the Act, which includes the provision dealing
       with "preventive services"—"shall be construed to require a qualified health plan to provide

coverage of [abortion] services . . . as part of its essential health benefits for any plan year." Section 1303(b)(1)(A). As is described in detail above, some of the drugs included as "FDA-approved contraceptives" under the HHS Mandate cause abortions by causing the demise of human embryos before and/or after implantation.

151.    The HHS Mandate is also contrary to the provisions of the Weldon Amendment of the Consolidated Security, Disaster Assistance, and Continuing Appropriations Act of 2009, Public Law 110 329, Div. A, Sec. 101, 122 Stat. 3574, 3575 (Sept. 30, 2008), which provides that "[n]one of the funds made available in this Act [making appropriations for Defendants Department of Labor and Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."

152.    The HHS Mandate also violates the provisions of the Church Amendment, 42 U.S.C. § 300a-7(d), which provides that "No individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions."

153.    The HHS Mandate is contrary to existing law and is in violation of the APA under 5 U.S.C. § 706(2)(A)f.

WHEREFORE, the Plaintiffs pray for the relief set forth below.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request the following relief:

A.      That this Court enter a judgment declaring the HHS Mandate and its application to Plaintiffs and others similarly situated but not before the Court to be an unconstitutional violation of their rights protected by RFRA, the Free Exercise, Establishment, and Free Speech Clauses of the First Amendment to the United States Constitution, the Due Process Clause of the Fifth Amendment to the United States Constitution, and the Administrative Procedure Act, and therefore invalid in any way applicable to them;

B.      That this Court enter a preliminary and a permanent injunction prohibiting Defendants from applying the HHS Mandate to Plaintiffs and others similarly situated but not before the Court in a way that substantially burdens the religious beliefs of Plaintiffs or any other person in violation of RFRA and the Constitution, and prohibiting Defendants from continuing to illegally discriminate against Plaintiffs and others not before the Court by requiring them to provide health insurance coverage for abortion-inducing contraception drugs, abortifacient drugs, and related education and counseling to their employees;

C.      That this Court award Plaintiffs their court costs and reasonable attorney's fees, as provided by the Equal Access to Justice Act and RFRA (as provided in 42 U.S.C. § 1988);

D.      That this Court grant such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a jury on all issues so triable.

Respectfully submitted this 4th day of March, 2013.

*Attorneys for Plaintiffs*:

s/ Michael J. Norton
Michael J. Norton
ALLIANCE DEFENDING FREEDOM
7951 E. Maplewood Avenue, Suite 100
Greenwood Village, CO 80111
(O) 720-689-2410
(F) 303-694-0703
mjnorton@alliancedefendingfreedom.org

Steven H. Aden
Matthew S. Bowman
ALLIANCE DEFENDING FREEDOM
801 G Street, NW, Suite 509
Washington, DC 20001
Tel.: 202-393-8690
Fax: 202-347-3622
saden@alliancedefendingfreedom.org
mbowman@alliancedefendingfreedom.org

David A. Cortman
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road NE
Suite D-1100
Lawrenceville, GA 30043
Tel.: 770-339-0774
Fax.: 770-339-6744
dcortman@alliancedefendingfreedom.org

and

Natalie L. Decker
The Law Office of Natalie L. Decker, LLC
26 W. Dry Creek Cr., Suite 600
Littleton, CO 80120
(O) 303-730-3009
(F) 303-484-5631
natalie@denverlawsolutions.com

## VERIFICATION OF VERIFIED COMPLAINT
## PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the facts set forth in foregoing Verified Complaint

are true and correct.

Executed on this 21st day of February, 2013.

_s/ W. L. (Bill) Armstrong_
W. L. (BILL) ARMSTRONG

State of Colorado      )
                       ) ss.
County of ~~Arapahoe~~ Jefferson  )

KERRY BLEIKAMP
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20084024292
MY COMMISSION EXPIRES AUGUST 10, 2016

Acknowledged, subscribed, and sworn to before me by W. L. (BILL) ARMSTRONG
this 21st day of February, 2013.

Witness my hand and seal.

My commission expires:

Notary Public

## VERIFICATION OF VERIFIED COMPLAINT
### PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the facts set forth in foregoing Verified Complaint are true and correct.

Executed on this 7th day of February, 2013.

_s//John A. May_____
JOHN A. MAY

State of Colorado       )
                        ) ss.
County of Arapahoe   )

Acknowledged, subscribed, and sworn to before me by JOHN A. MAY this 7th day of February, 2013.

Witness my hand and seal.

My commission expires: 2/4/2014

_____
Notary Public

My Commission Expires 02/04/2014

## VERIFICATION OF VERIFIED COMPLAINT
## PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the facts set forth in foregoing Verified Complaint

are true and correct.

Executed on this **27** day of February, 2013.

_s/ William L. (Wil) Armstrong III_
WILLIAM L. (WIL) ARMSTRONG III


State of Colorado      )
                       ) ss.
County of Arapahoe   )

Acknowledged, subscribed, and sworn to before me by WILLIAM L. (WIL)
ARMSTRONG III this 27 day of February, 2013.

Witness my hand and seal.

My commission expires: November 13, 2013

Notary Public

STEPHANIE B WETHERBY
Notary Public
State of Colorado

## VERIFICATION OF VERIFIED COMPLAINT
## PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the facts set forth in foregoing Verified Complaint

are true and correct.

Executed on this 7ᵗʰ day of February, 2013.

_s/ Jeffrey S. May_

JEFFREY S. MAY, individually and as
President and CEO of Plaintiff Cherry
Creek Mortgage Co., Inc.

State of Colorado    )
                 ) ss.
County of Arapahoe   )

Acknowledged, subscribed, and sworn to before me by JEFFREY S. MAY, individually
and as President and CEO of Plaintiff Cherry Creek Mortgage Co., Inc. this 7ᵀᴴ day of February,
2013.

Witness my hand and seal.

My commission expires: 2/4/2014

_Lavonne A. Oxford_
Notary Public

[Notary Seal: LAVONNE A. OXFORD — NOTARY PUBLIC — STATE OF COLORADO]

My Commission Expires 02/04/2014

## VERIFICATION OF VERIFIED COMPLAINT
## PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the facts set forth in foregoing Verified Complaint

are true and correct.

Executed on this 25 day of February, 2013.

_s/ Dorothy A. Shanahan_
DOROTHY A. SHANAHAN

State of Colorado        )
                         ) ss.
County of Arapahoe       )

Acknowledged, subscribed, and sworn to before me by DOROTHY A. SHANAHAN this
25th day of February, 2013.

Witness my hand and seal.

My commission expires: 08-29-15

_____
Notary Public

CHRISTINE FORSYTHE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20114054804
MY COMMISSION EXPIRES 8/29/2015